Filed 5/28/24; certified for publication 6/25/24 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LUSARDI CONSTRUCTION COMPANY, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> DEPARTMENT OF INDUSTRIAL RELATIONS et al., <br><br> Defendants and Respondents, <br><br> DIVISION OF LABOR STANDARDS ENFORCEMENT, <br><br> Real Party in Interest and Respondent. | D081704 <br><br><br> (Super. Ct. No. 37-2020-00021750-CU-WM-NC) |

APPEAL from an order of the Superior Court of San Diego County, Robert P. Dahlquist, Judge. Affirmed.

Herold & Sager and Nicholas B. Salerno for Plaintiff and Appellant.

No appearance for Defendants and Respondents Department of Industrial Relations and Katrina S. Hagen.

Lance A. Grucela for Real Party in Interest and Respondent.

Plaintiff and appellant Lusardi Construction Company's (Lusardi) subcontractor, Pro Works Contracting Inc. (Pro Works), violated certain Labor Code[1] provisions by failing to hire apprentices for construction of the San Marcos K-8 School Project (the Project).  Defendants and respondents Department of Industrial Relations, its director Katrina S. Hagen (the Director), and real party in interest and respondent, Division of Labor Standards Enforcement (DLSE) cited Pro Works for those violations.  Following an investigation, DLSE ordered Lusardi to pay penalties for the violations.  Lusardi's administrative appeal was unsuccessful, and it thereafter filed a petition for writ of administrative mandamus under Code of Civil Procedure section 1094.5, which the superior court denied.

Lusardi contends the superior court erroneously concluded that:  (1) the Director's interpretation of former section 1777.7 subdivision (d) was proper; (2) substantial evidence supported a finding Lusardi knew of Pro Works's violations; (3) section 1743, subdivision (a)'s joint and several liability provision applied; (4) substantial evidence supported the amount of the penalty assessed against Pro Works; and (5) Lusardi was not denied due process.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In 2014, San Marcos Unified School District (the District) awarded Lusardi a contract to construct the Project.  Lusardi subcontracted with Pro Works to install the iron reinforcing work for the Project.

---

[1]     Undesignated statutory references are to the 2014 versions of the Labor Code.  We grant the parties' separate requests to take judicial notice of different items of legislative history under Evidence Code section 452; however, we deny the portion of Lusardi's request seeking judicial notice of a decision of the Department of Industrial Relations because that decision is not necessary for our disposition of this appeal.

*The DLSE Investigation*

In 2015, DLSE opened an investigation into a complaint that Pro Works violated former section 1777.5 by failing to: (1) provide contract award information; (2) request dispatch of apprentices from applicable apprentice committees; (3) employ registered apprentices in compliance with a required apprentice to journeyperson ratio; and (4) make certain required training fund contributions to an approved apprenticeship program.

Deputy Labor Commissioner Kari Anderson served the following documents on Lusardi and Pro Works: a "notice of investigation," a "request for payroll records," a "statement of employer payments" form, and a "notice of apprenticeship compliance" form, which in turn sought Department of Apprenticeship Standards (DAS) forms[2] and "accounting and proof of

_____

[2] The notice of apprenticeship compliance form states that a DAS 140 form relates to "contract award information (or equivalent) with proof of submission to applicable apprenticeship committees," and a DAS 142 form relates to a "request for dispatch of an apprentice (or equivalent) with proof of submission to applicable apprenticeship committees." (Some capitalization omitted.)

The documents sought are routinely used by contractors who are awarded public contracts. Former section 1777.5 subdivision (e) provided: "Before commencing work on a contract for public works, every contractor shall submit contract award information to an applicable apprenticeship program that can supply apprentices to the site of the public work. The information submitted shall include an estimate of journey[person] hours to be performed under the contract, the number of apprentices proposed to be employed, and the approximate dates the apprentices would be employed. A copy of this information shall also be submitted to the awarding body, if requested by the awarding body. Within 60 days after concluding work on the contract, each contractor and subcontractor shall submit to the awarding body, if requested, and to the apprenticeship program a verified statement of the journey[person] and apprentice hours performed on the contract. The information under this subdivision shall be public. The apprenticeship programs shall retain this information for 12 months."

3

payment of the training fund contributions to California Apprenticeship Council or approved apprenticeship program." (Some capitalization omitted.)

The entities responded differently to Anderson's documents request. The District provided some information but stated Lusardi "holds all certified payroll [records (CPR's)] on sub-contractors." Pro Works provided some CPR's but only after the Project was completed, claiming the tardy submission was due to staff turnover. Lusardi provided no information, and Anderson testified she did not hear from or communicate with any Lusardi representative during her investigation.

Anderson issued a "Penalty Review" summarizing her findings. She concluded that in February 2015, Pro Works violated the statutes and regulations relating to apprenticeships by failing to submit compliant DAS 140 and 142 forms and other required information. Anderson found that Pro Works "failed to hire any apprentices." She also concluded Pro Works had a "history" of apprentice violations, and specifically listed their dates and descriptions. Anderson concluded the penalty should be assessed based on Pro Works's failure to comply with four out of the five factors set forth in former section 1777.7, subdivision (f).[3] Anderson testified that Senior Deputy Labor Commissioner Michael Nagtalon reviewed her report and

---

[3] Former section 1777.7, subdivision (f) listed five factors the Labor Commissioner "shall consider" in calculating the monetary penalty. "Whether the party has committed other violations of section 1777.5. [¶] Whether, upon notice of the violation, the party took steps to voluntarily remedy the violation. [¶] Whether, and to what extent, the violation resulted in lost training opportunities for apprentices. [And] [¶] Whether, and to what extent, the violation otherwise harmed apprentices or apprenticeship programs." The fifth factor, and the one Anderson did not find applicable here, was "whether the violation was intentional."

4

assessed penalties in the amount of $30,800, consisting of $200 per each of 154 days of section 1777.5 violations.

Lusardi timely filed a request for review of Anderson's decision with the Director.

Before the review hearing started, the hearing officer ruled the 2014 version of the relevant Labor Code provisions and regulations would apply, based on the Project's bid advertisement date. He also ruled regarding the burden of proof that "DLSE will have to come forward with sufficient evidence to provide prima facie support for the penalty assessment, including evidence of Lusardi's knowledge of the alleged violation by the subcontractor or Lusardi's alleged failure to comply with the requirements of [former section] 1777.7[, subdivision] (d).[4] If this is done, Lusardi will have . . . the

---

4    Former section 1777.7, subdivision (d) provided: "If a subcontractor is found to have violated Section 1777.5, the prime contractor of the project is not liable for any penalties under subdivision (a), unless the prime contractor had knowledge of the subcontractor's failure to comply with the provisions of Section 1777.5 or unless the prime contractor fails to comply with any of the following requirements: [¶] (1) The contract executed between the contractor and the subcontractor or the performance of work on the public works project shall include a copy of the provisions of Sections 1771, 1775, 1776, 1777.5, 1813, and 1815. [¶] (2) The contractor shall continually monitor a subcontractor's use of apprentices required to be employed on the public works project pursuant to subdivision (d) of Section 1777.5, including, but not limited to, periodic review of the certified payroll of the subcontractor. [¶] (3) Upon becoming aware of a failure of the subcontractor to employ the required number of apprentices, the contractor shall take corrective action, including, but not limited to, retaining funds due the subcontractor for work performed on the public works project until the failure is corrected. [¶] (4) Prior to making the final payment to the subcontractor for work performed on the public works project, the contractor shall obtain a declaration signed under penalty of perjury from the subcontractor that the subcontractor has employed the required number of apprentices on the public works project."

burden of proof set forth in [California Code of Regulations, title 8, section] 232.50[, subdivision] (b)."[5]

On the first day of the hearing, Lusardi's counsel initially stated three of its representatives as well as Nagtalon would testify. Counsel stated Nagtalon was a necessary witness. But Nagtalon was not available. DLSE's sole witness, Anderson, was the only person who testified that day.

On the second and last day of the hearing, Lusardi's counsel sought the testimony of Nagtalon, who was under subpoena. DLSE's counsel explained Nagtalon was unavailable as he was outside of the country, but he offered to produce Nagtalon for a rescheduled hearing. However, Lusardi elected not to request a continuance to obtain Nagtalon's testimony or to put on its case. Instead, its counsel stated, "Lusardi will rest without presenting any further evidence and will not move any of Lusardi's exhibits into evidence in this matter." Counsel explained: "We are not going to present any evidence because we feel very strongly the Labor Commissioner has failed to meet its burden in this matter."

*The Director's Review*

The Director affirmed the hearing officer's findings, concluding DLSE met its burden to present evidence showing prima facie support for the penalty assessment, including that Lusardi knew of Pro Works's violations and was liable for the penalties. The Director summarized Anderson's testimony at length. In concluding Pro Works violated the apprentice requirements, the Director explained that former section 1777.5 and the applicable regulations required an employer who had obtained certain public work contracts to hire apprentices to perform one hour of work for every five

---

[5]     California Code of Regulations, title 8, section 232.50, subdivision (b) was subsequently repealed.

hours of work performed by journeypersons in the applicable craft or trade. She stated that under the applicable regulation, "a contractor shall not be considered in violation of the 1:5 ratio requirement if it has properly requested the dispatch of apprentices and no apprenticeship committee in the geographic are[a] of the public works project dispatches apprentices during the pendency of the project, provided the contractor made the request in enough time to meet the required ratio." The Director concluded, "There is no dispute that Pro Works failed to employ any apprentices on the Project."

The Director also concluded Pro Works violated former section 1777.5, subdivision (e) and the applicable regulations, including by failing to submit proper contract award information to an apprenticeship program. The Director summarized Pro Works's violations: "Pro Works had first assigned an Iron Worker journeyperson to work on the Project on December 23, 2014. In light of that evidence, it was reasonable for DLSE to infer that Pro Works knew of its apprentice needs by February 23, 2015. Indeed, given all the facts in the record, it is also reasonable to infer that Pro Works never had any intention of employing apprentices on this Project in December of 2014, in February of 2015, or even in May of 2015 when it finally submitted a complete and valid DAS 140 form. That Anderson did not directly inquire of Pro Works or make a finding as to the state of Pro Works'[s] knowledge of apprentice needs does not detract from the record of Pro Works'[s] violations in this case."

The Director further concluded Pro Works failed to properly request dispatch of apprentices, adding: "Pro Works'[s] violations of apprentice requirements are deemed to be 'knowing' within the meaning of [former]

7

section 1777.7, subdivision (a)(1).[6] This is so because, as reflected in DLSE records, Pro Works had previously been found to have violated [former] section 1777.5."

The Director stated DLSE presented prima facie support for the calculation of penalty days. The Director further pointed out Anderson checked four of the boxes on a pre-printed form corresponding to the former section 1777.7, subdivision (f) factors. The Director reasoned: "According to Anderson's testimony and the penalty review, Nagtalon considered the five penalty factors, approved the penalty review prepared by Anderson, and set the penalty rate at $200.00 per violation 'due to the nature of the violations,' before returning the penalty review to Anderson for preparation of the assessment. These facts establish a prima facie showing that Nagtalon reviewed the summary of the investigation prepared by Anderson, considered the statutory factors, and properly exercised his discretion in setting the penalty rate." (Some capitalization omitted.)

---

[6] Former section 1777.7, subdivision (a)(1) provided that a contractor or subcontractor that is determined by the Labor Commissioner to have knowingly violated former section 1777.5 shall forfeit as a civil penalty $100 per day of noncompliance, but if there are subsequent violations within a three-year period, the penalty shall be not more than $300 for each full calendar day of noncompliance.

The Director concluded the penalty rate per violation was appropriately high.[7]  She pointed out that Pro Works's violations were intentional and it had a history of other apprentice violations.  Moreover, Pro Works took few meaningful steps to voluntarily remedy its violations upon its receipt of the initial packet, which occurred before the end of the Project.

The Director made a specific finding Lusardi was liable for the penalty assessed because under former section 1777.7 subdivision (a)'s first prong, "DLSE produced evidence that Lusardi knew about the ongoing apprentice violations by Pro Works, and that it possessed this knowledge while the Project was still underway and while Pro Works was using ironworker journeypersons on the Project.  DLSE's initial investigation packet, received by Lusardi on April 24, 2015, placed Lusardi on notice that DLSE had a

---

[7]     The Director concluded:  "DLSE properly calculated the number of days that Pro Works was in violation of the apprenticeship requirements. . . . DLSE could have extended the penalty period back to ten days from the execution of the subcontract, but instead DLSE took the more conservative course and counted 135 penalty days from the day after the first day Pro Works had workers on the Project (December 22, 2014) to the May 7, 2015 date of the first valid DAS 140 form that Pro Works submitted.  To those 135 penalty days, DLSE properly added another 19 days' worth of ratio violations, representing the number of work days that Pro Works had journeypersons on the Project with no apprentices between May 7, 2015, and June 23, 2015, Pro Works'[s] last day on the Project.  [¶]  The best evidence for the duration of both penalties would have been a complete set of CPR[']s.  However, the copy admitted into evidence at the hearing ends on March 28, 2015, and is therefore incomplete, in and of itself. . . .  The gap in the evidentiary record between March 28, 2015, and June 23, 2015, was bridged by Anderson's oral testimony, the penalty review Anderson prepared, and the DAS 142 forms prepared by Pro Works in May and June 2015.  Altogether, this evidence provides prima facie support for the duration of the penalty period as calculated by DLSE, even in the absence of a complete set of Pro Works'[s] CPR[']s.  Lusardi presented no evidence to carry its burden to disprove the basis for, or the accuracy of, DLSE's showing as to the number of penalty days."  (Footnote and some capitalization omitted.)

complaint that Pro Works was not in compliance with section 1777.5.  DLSE's packet specified the nature of the alleged violations, most notably on the notice of apprenticeship compliance, where Lusardi and this Project were identified.  On April 29, 2015, Pro Works's principal Gary Lane informed Anderson that Lusardi was withholding a retention from Pro Works in connection with the complaint about apprentice violations."  (Some capitalization omitted.)

The Director added:  "In this case, DLSE produced prima facie evidence that Lusardi had knowledge of Pro Works'[s] apprentice violations, thus satisfying the first prong of [former section 1777.7,] subdivision (d).  This conclusion could have conceivably been rebutted by Lusardi, but Lusardi did not deny it had knowledge.  Had Lusardi denied knowledge, evidence may have been explored as to whether Lusardi failed to comply with the second prong of subdivision (d).  However, in the absence of such evidence, it is reasonable to infer that Lusardi possessed knowledge, thereby depriving Lusardi of the safe harbor from liability for Pro Works'[s] violations."

The Director rejected Lusardi's claim of due process violations:  "Given DLSE's evidence supporting a prima facie showing of Lusardi's knowledge of actual and ongoing apprentice violations by Pro Works during the course of the Project, and given the opportunity to be heard in the form of the hearing, Lusardi was not deprived of its due process rights.  Lusardi was put on notice by the contents of DLSE's initial packet, and it cannot plausibly assert that its potential liability was not manifest from the start of DLSE's investigation. . . .  Further, by virtue of section 1743 and former section 1777.7, Lusardi was on notice that its liability was at issue."  (Footnote omitted.)

10

*Writ Proceedings*

Lusardi filed a petition for writ of administrative mandate arguing the Director's decision should be invalidated: "[DLSE] acted in excess of its authority and contrary to [former] sections 1777.5 and 1777.7 in issuing an excessive and unsupported civil wage and penalty assessment against [Pro Works] for alleged apprentice employment violations. In turn, the [Director] improperly affirmed the assessment and, in direct contravention to the rule of law set forth in [former] section 1777.7 subdivision (d) that a prime contractor is not liable for the apprentice violations of a subcontractor, found that Lusardi is liable for the assessment against its subcontractor without sufficient evidence to show that Lusardi either had knowledge of Pro Works'[s] alleged violation or that Lusardi failed to comply with any of the requirements of [former section 1777.7] subdivision (d)(1)-(4). In doing so, the [Director] proceeded in excess of her jurisdiction, without affording Lusardi a fair hearing, and prejudicially abused her discretion."

Lusardi further argued, "The DLSE failed to produce . . . Nagtalon pursuant to a timely served subpoena to compel his attendance at the hearing on merits in order to allow Lusardi to examine him as to how the daily penalty rate assessed against Pro Works was determined pursuant to [former] section 1777.7, subdivision (f)." (Some capitalization omitted.)

Lusardi also sought declaratory relief "as to the legality of the decision and order and the DLSE's enforcement against [it] under section[ ] 1743 and [former section] 1777.7[,] including a determination of the question of validity." (Some capitalization omitted.)

The superior court denied Lusardi's writ petition, interpreting former section 1777.7 subdivision (d) in the disjunctive: "Based on the plain language of the statute, the [c]ourt believes that the Legislature intended for

11

the [Director] to have the burden of establishing that petitioner had knowledge of the subcontractor's failure to comply with [former section] 1777.5 **or** that petitioner failed to comply with any [of] the requirements set forth in [former section 1777.7 subdivision] (d)(1)-(4). [¶] . . . [¶] The Director focused on the first prong of [former section] 1777.7[,subdivision] (d), and made a finding that Lusardi had knowledge of the subcontractor's apprentice violations."

The court further found that substantial evidence supported the findings "relating to the amount of the penalty assessment" based on the Director's independent review of the penalty amount. It also found the CPR's provided substantial evidence showing Lusardi knew of Pro Works's failure to hire any apprentices.

The court rejected Lusardi's claim it was denied due process: "[A]s a result of the notices given to Lusardi, and the applicable provisions of the law pertaining to public works projects, the [c]ourt is satisfied that Lusardi was on notice of the potential for being held jointly and severally liable for Pro Works'[s] apprentice hiring violations."

The court also ruled: "[T]he Director had the obligation to, and did, conduct a de novo consideration of any penalties to be assessed. As such, . . . Nagtalon was not the ultimate decision-maker concerning the amount of the penalty. While the [c]ourt believes that the better practice for the DLSE would have been to produce . . . Nagtalon for examination at the administrative hearing, the [c]ourt is not persuaded that the failure to produce . . . Nagtalon resulted in a violation of Lusardi's due process rights."

12

DISCUSSION

I. *Interpretation of Former Section 1777.7, Subdivision (d)*

Lusardi contends the court erroneously adopted the Director's "interpretation and unprecedented application of the two prongs of [former] section 1777.7, subdivision (d)(1)-(4)." (Bold and capitalization omitted.)

A. *Standard of Review*

"Statutory construction is a question of law we decide de novo. [Citation.] Our primary objective in interpreting a statute is to determine and give effect to the underlying legislative intent. [Citation.] Intent is determined foremost by the plain meaning of the statutory language. If the language is clear and unambiguous, there is no need for judicial construction. When the language is reasonably susceptible of more than one meaning, it is proper to examine a variety of extrinsic aids in an effort to discern the intended meaning. We may consider, for example, the statutory scheme, the apparent purposes underlying the statute and the presence (or absence) of instructive legislative history." (*Starving Students, Inc. v. Department of Industrial Relations* (2005) 125 Cal.App.4th 1357, 1363.)

The California Supreme Court has stated: "The conditions of employment on construction projects financed in whole or in part by public funds are governed by the prevailing wage law [set forth in sections 1720 through 1861]." (*Lusardi Construction Co. v. Aubrey* (1992) 1 Cal.4th 976, 985.) "This statutory scheme also governs the employment of apprentices. Section 1777.5 requires the employment of apprentices on public works projects under the terms of a statutory formula, and mandates that the awarding body insert stipulations in the construction contract requiring compliance with the apprenticeship provisions of the prevailing wage law. Section 1777.7 specifies sanctions for failure to comply with the

13

apprenticeship requirements, including debarment from public works contracting and monetary penalties." (*Lusardi v. Aubry, supra*, at p. 986, & fn. 2.)

In interpreting the disjunctive parts of former section 1777.7, subdivision (d), we turn to one court's discussion of the challenges in interpreting the conjunction "or":  " 'The fact *is* that there is nothing very plain about the use of the connective "or" in legal drafting.'  [Citation.] ' "Sometimes it joins alternatives; sometimes it doesn't.  Sometimes *or* means *and*; sometimes it doesn't[ ]." ' [Citation.]  Additionally, if 'or' is a disjunctive connector, sometimes it connects words in the inclusive sense (i.e., A or B, or both); other times, it connects words in the exclusive sense (i.e., A or B, but not both).  [Citation.]  Thus, the potential ambiguity created by 'or' is not one dimensional." (*Dow v. Honey Lake Valley Resource Conservation Dist.* (2021) 63 Cal.App.5th 901, 903-904.)

" ' "Legal sources differ on which meaning of 'or' [(as inclusive or exclusive)] is authoritative.  In the realm of symbolic logic, the exclusive 'or,' otherwise known as the exclusive disjunction, means that only one of the propositions or terms joined by the disjunction can be true.  'Jim is eight or nine years old' is exemplary of an exclusive disjunction because only one proposition in the disjunction can be true.  On the other hand, an inclusive disjunction assumes that either one or both of the terms or propositions on either side of the disjunction are true.  A sentence like, 'X will call or e[-]mail Y,' does not necessarily denote an exclusive disjunction, but rather, it leaves open the possibility that X could call *and* e[-]mail Y.  Essentially, an inclusive disjunction allows the possibility of either option, or both, which is also the literal meaning of *and/or*." ' [Citation.]  '[I]t has been asserted that, in legal drafting, it is more often the case that the connective "or" is used in the

14

inclusive sense' [citation] and '[i]n ordinary English, the phrase "P or Q" on its own often suggests the inclusive sense of "or." ' " (*Dow v. Honey Lake Valley Resource Conservation Dist., supra*, 63 Cal.App.5th at pp. 913-914.)

We conclude the court did not err in interpreting former section 1777.7, subdivision (d). The statute's plain language provides two inclusive and alternative ways for imposing liability on a prime contractor for penalties resulting from the subcontractor's violations of former section 1777.5. Specifically, first, the prime contractor is not liable for the penalties "unless [it] had knowledge of the subcontractor's failure to comply" with the statute; or, second, it is not liable for the penalties "unless the prime contractor fails to comply with any of the" requirements set forth in the remainder of section (d). (Former § 1777.7, subd. (d).) The DLSE properly determined that under former section 1777.7 subdivision (d)'s first prong, Lusardi had knowledge of Pro Works's failure to comply with the applicable apprentice provisions set forth in former section 1777.5. That finding sufficed for the court to conclude Lusardi was liable for Pro Works's violations of former section 1777.7, subdivision (d).

Our conclusion regarding the proper interpretation of former section 1777.7, subdivision (d) is bolstered by another court, which interpreted a

15

parallel provision in section 1775, subdivision (b),[8] that is also phrased in the disjunctive, as follows: "[T]he prime contractor is not liable for any monetary penalties unless the prime contractor knew the subcontractor had not paid prevailing wages to the subcontractor's workers **or** unless the prime contractor fails to provide for the payment of prevailing wage in its contract with the subcontractor; to monitor such payments by reviewing the payroll records of the subcontractor; to undertake withholding, if necessary; and to obtain an affidavit from the subcontractor asserting payment was made." (*Violante v. Communities Southwest Development & Construction Co.* (2006) 138 Cal.App.4th 972, 979, bold added.)

---

[8]     Section 1775, subdivision (b) provides: "If a worker employed by a subcontractor on a public works project is not paid the general prevailing rate of per diem wages by the subcontractor, the prime contractor of the project is not liable for any penalties under subdivision (a) *unless* the prime contractor had knowledge of that failure of the subcontractor to pay the specified prevailing rate of wages to those workers *or unless* the prime contractor fails to comply with all of the following requirements:  [¶]  (1) The contract executed between the contractor and the subcontractor for the performance of work on the public works project shall include a copy of the provisions of this section and Sections 1771, 1776, 1777.5, 1813, and 1815.  [¶]  (2) The contractor shall monitor the payment of the specified general prevailing rate of per diem wages by the subcontractor to the employees, by periodic review of the certified payroll records of the subcontractor.  [¶]  (3) Upon becoming aware of the failure of the subcontractor to pay his or her workers the specified prevailing rate of wages, the contractor shall diligently take corrective action to halt or rectify the failure, including, but not limited to, retaining sufficient funds due the subcontractor for work performed on the public works project.  [¶]  (4) Prior to making final payment to the subcontractor for work performed on the public works project, the contractor shall obtain an affidavit signed under penalty of perjury from the subcontractor that the subcontractor has paid the specified general prevailing rate of per diem wages to his or her employees on the public works project and any amounts due pursuant to Section 1813." (Italics added.)

16

In Lusardi's alternative interpretation of former section 1777.7, subdivision (d), that provision "is intended to preclude the prime contractor's liability for a subcontractor's apprentice violation unless the prime contractor possessed knowledge of the subcontractor's apprentice violations *or, if so,* failed to comply with the requirements set forth in subsection[s] (1)-(4)." (Italics added, bold and some capitalization omitted.) Lusardi's addition of those two words, "if so," completely alters the meaning of the statute in a way that the Legislature did not contemplate, and that we therefore cannot accept. "In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted." (Code Civ. Proc., § 1858; *Vikco Ins. Services, Inc. v. Ohio Indemnity Co.* (1999) 70 Cal.App.4th 55, 61.) "Thus, ' ". . . '[i]n construing . . . statutory provisions a court is not authorized to insert qualifying provisions not included and may not rewrite the statute to conform to an assumed intention which does not appear from its language.' " ' " (*Vikco*, at p. 62.)

II. *Substantial Evidence that Lusardi Knew of Pro Works's Violations*

Lusardi contends the superior court erroneously concluded that substantial evidence supported the Director's finding Lusardi had knowledge of Pro Works's apprentice violations. It specifically contends that no evidence showed Lusardi was provided the CPR's that Pro Works produced at trial. Lusardi further contends the CPR's do not facially demonstrate whether Pro Works's failure to employ apprentices on the project was a violation of any apprentice requirements, and those records have no bearing on whether Pro Works submitted contract award information to an applicable apprentice program. Finally, Lusardi contends Anderson's testimony and case notes

17

cannot support the finding Lusardi withheld a retention from Pro Works in connection with the complaint about apprentice violations.

A superior court's review of an agency's adjudicatory administrative decision under Code of Civil Procedure section 1094.5 is subject to two possible standards depending on the nature of the rights involved. (*Mann v. Department of Motor Vehicles* (1999) 76 Cal.App.4th 312, 320.) If the administrative decision involved or substantially affected a "fundamental vested right," the superior court exercises its independent judgment upon the evidence disclosed in a limited trial de novo in which the court must examine the administrative record for errors of law and exercise its independent judgment upon the evidence. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143-144 (*Bixby*); Code Civ. Proc., § 1094.5, subd. (c).) The theory behind this kind of review is that abrogation of a fundamental vested right "is too important to the individual to relegate it to exclusive administrative extinction." (*Bixby,* at p. 144.) Where no fundamental vested right is involved, the superior court's review is limited to examining the administrative record to determine whether the adjudicatory decision and its findings are supported by substantial evidence in light of the whole record. (*Bixby,* at pp. 143-144.) Substantial evidence must be " 'of ponderable legal significance,' " which is reasonable in nature, credible and of solid value. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)

"Regardless of the nature of the right involved or the standard of judicial review applied in the trial court, an appellate court reviewing the superior court's administrative mandamus decision always applies a substantial evidence standard. [Citations.] But depending on whether the trial court exercised independent judgment or applied the substantial evidence test, the appellate court will review the record to determine whether

18

either the trial court's judgment or the agency's findings, respectively, are supported by substantial evidence.  [Citation.]  If a fundamental vested right was involved and the trial court therefore exercised independent judgment, it is the trial court's judgment that is the subject of appellate court review.  [Citations.]  On the other hand, if the superior court properly applied substantial evidence review because no fundamental vested right was involved, then the appellate court's function is identical to that of the trial court.  It reviews the administrative record to determine whether the agency's findings were supported by substantial evidence, resolving all conflicts in the evidence and drawing all inferences in support of them.  [Citations.]  [¶]  If the administrative findings are supported by substantial evidence, the next question is one of law—whether those findings support the agency's legal conclusions or its ultimate determination.  [Citation.]  If the administrative record reveals the theory upon which the agency has arrived at its ultimate decision, the decision should be upheld so long as the agency found those facts that as a matter of law are essential to sustain the decision." (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1058, fn. omitted.)  Here, as the trial court reviewed the administrative record for substantial evidence, we apply that same standard to the agency's findings.

Former section 1777.5, subdivision (d) provides:  "When the contractor to whom the contract is awarded by the state or any political subdivision, in performing any of the work under the contract, employs workers in any apprenticeable craft or trade, the contractor shall employ apprentices in at least the ratio set forth in this section and may apply to any apprenticeship program in the craft or trade that can provide apprentices to the site of the public work for a certificate approving the contractor under the

apprenticeship standards for the employment and training of apprentices in the area or industry affected." Former section 1777.5, subdivision (g) specifies: "The ratio of work performed by apprentices to journey[persons] employed in a particular craft or trade on the public work may be no higher than the ratio stipulated in the apprenticeship standards under which the apprenticeship program operates where the contractor agrees to be bound by those standards, but, except as otherwise provided in this section, in no case shall the ratio be less than one hour of apprentice work for every five hours of journey[person] work."

The record establishes that the District reported to Anderson that Lusardi kept the CPR's for the Project. That would be consistent with former section 1776, subdivision (a)'s requirement: "Each contractor and subcontractor shall keep accurate payroll records, showing the name, address, social security number, work classification, straight time and overtime hours worked each day and week, and the actual per diem wages paid to each journey[person], apprentice, worker, or other employee employed by him or her in connection with the public work. Each payroll record shall contain or be verified by a written declaration that it is made under penalty of perjury, stating both of the following: [¶] (1) The information contained in the payroll record is true and correct. [¶] (2) The employer has complied with the requirements of Sections 1771, 1811, and 1815 for any work performed by his or her employees on the public works project."

Anderson concluded the CPR's did not show that Pro Works recorded any apprentice hours worked. It follows that Pro Works failed to comply with the ratio of apprentice journeypersons ratio set forth in former section 1777.5, subdivision (a). As nothing in the record contradicts Andersons's finding, the

Director did not err by concluding that Lusardi knew, based on the CPR's it retained, that Pro Works did not hire any apprentices.

### III. *Section 1743's Joint and Several Liability Provision*

Lusardi contends, "Although it is not clear whether the Superior Court relied on the application of any joint and several provisions contained in section 1743[, subdivision] (a) in any meaningful way, the appellant is merely advising the court that it does not apply to create any sort of presumption that must be overcome by operation of [former section] 1777.7 [, subdivision] (d)." (Some capitalization omitted.) Lusardi relies on a case issued by the Director of Industrial Relations (*Matter of W.A. Thomas Company, Inc.*, Director of Industrial Relations (July 26, 2017) No. 12-0106-PWH) and argues that "any analysis of the legislative intent behind [former section] 1777.7[,subdivision] (d) should begin with a presumption that a prime contractor is not liable for a subcontractor's apprentice violations unless the exceptions to this rule are found to apply."

The DLSE counters that the legislative history of section 1743 demonstrates its applicability. It also argues Lusardi's reliance on the administrative decision is misplaced as it is not precedential and, in any event, it does not state the conclusion for which Lusardi cites it, namely that section 1743, subdivision (a) "applies to penalties for wage violations" and not to penalties for violations of the Labor Code's apprenticeship provisions.

Section 1743, subdivision (a)'s language is plain. It provides: "The contractor and subcontractor shall be jointly and severally liable for all amounts due pursuant to a final order under this chapter or a judgment thereon. The Labor Commissioner shall first exhaust all reasonable remedies to collect the amount due from the subcontractor before pursuing the claim against the contractor." Under this statue, both the contractor and

21

subcontractor are jointly and severally liable for the penalties due.  The Director's order here is a final order under the prevailing laws, and is encompassed by this statute.

In light of the above, we need not rely on section 1743's legislative history.  But even if we did, it supports our conclusion that the Legislature intended for contractors and subcontractors to be held jointly and severally liable for penalties imposed by the Labor Commissioner.  An analysis of the proposed section 1743 legislation stated:  "Existing law, . . . [s]ection 1775[, subdivision] (d), provides that 'the contractor and subcontractor shall be jointly and severally liable in the enforcement action for any wages due,' and specifies that the contractor is liable for collection only after enforcement of all reasonable remedies against the subcontractor has been exhausted. Section 1775[, subdivision] (b) makes a prime contractor liable for penalties for a subcontractor's violation of the law when the contractor either knows of the subcontractor's violation or fails to follow specific procedures to require the subcontractor to comply with the prevailing wage law and to monitor compliance.  [¶]  This bill would expressly hold a contractor jointly and severally liable for all amounts due (including penalties) pursuant to a final assessment of the commissioner or a judgment thereon."  (Sen. Floor Analysis of Sen. Bill No. 1646 (1999-2000 Reg. Sess.)

IV. *Substantial Evidence Supported the Penalty Assessment Imposed*

Lusardi contends the superior court erroneously found that substantial evidence supported the penalty assessment:  "Neither the certified payroll records nor any other evidence presented by the DLSE support the 154 penalty day calculation assessed against Pro Works.  Accordingly, there is no substantial evidence in the record to support the penalty assessment of $30,800 based on 154 penalty days."  Lusardi contends:  "The [Director's]

22

purported de novo review of the penalty amount is not based on substantial evidence." (Bold and some capitalization omitted.)

The record shows that Anderson checked the four boxes corresponding to the applicable former section 1777.7, subdivision (f) factors supporting her determination that penalties should be imposed. She testified regarding how she computed the number of days of violation, based on 154 days, 4,355 hours and zero apprentice hours. Anderson further testified Nagtalon reviewed her report and calculated the amount of penalty to be imposed for each day of violation.

The Director exercised her de novo authority in reviewing the penalty, and concluded "DLSE properly calculated the number of days that Pro Works was in violation of the apprenticeship requirements." For the reasons stated in Anderson's report and the Director's independent review, we conclude substantial evidence supported the penalty imposed. "[W]here, as here, our review is limited to examining the whole administrative record to determine if the [Labor Commissioner's] findings and order are supported by substantial evidence, it is not our function to reweigh the evidence or the particular factors cited by the [Labor Commissioner] in support of [the] decision . . . . Once we conclude, as we have here, that the [Labor Commissioner's] findings are indeed supported by substantial evidence, and that those findings in turn support the . . . legal conclusion or ultimate determination, our analysis is at an end." (*JKH Enterprises, Inc. v. Department of Industrial Relations, supra*, 142 Cal.App.4th at p. 1066.)

## V. *Claims of Due Process Violation*

Due process has been identified as requiring notice, an opportunity to be heard in a meaningful way, and an impartial adjudicator. (*Today's Fresh*

*Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 212.)

Lusardi contends the court erroneously found there was no due process violation; rather, the DLSE's "Notice of apprentice compliance provided to Lusardi with the notice of investigation is addressed only to Pro Works and includes no indication that the DLSE is investigating whether Lusardi should be liable for Pro Works's alleged violations. . . . [N]or did the DLSE request any information from Lusardi as part of its investigation. . . . Instead, the DLSE's actions suggested no intent to hold Lusardi liable and an understanding that Lusardi is provided safe harbor under [former] section 1777.7[, subdivision] (d)(1)-(4)." (Some capitalization omitted.)

The DLSE notices that were sent to Lusardi complied with due process by identifying Lusardi as the prime contractor and Pro Works as its subcontractor. The notice of investigation was addressed to Lusardi directly and advised it that the Labor Commissioner would issue an assessment pursuant to it under section 1741[9] if violations were found. The notice of apprenticeship compliance specifically states, "Non-compliance will result in civil penalties . . . per . . . [former] section 1777.7." We conclude the DLSE notices adequately provided Lusardi notice of the potential to be held jointly and severally liable.

Lusardi also contends it was denied its due process right to confront Nagtalon at a hearing "to examine whether the DLSE could satisfy its burden to show that all the circumstances set forth in [former] section 1777.7,

---

9 Section 1741, subdivision (a) provides: "If the Labor Commissioner or his or her designee determines after an investigation that there has been a violation of this chapter, the Labor Commissioner shall with reasonable promptness issue a civil wage and penalty assessment to the contractor or subcontractor, or both."

subdivision (f), subparagraphs (1)-(4) were considered in the setting of the penalty assessment."

The record of the second hearing shows Lusardi elected not to request a continuance to obtain Nagtalon's testimony. Rather, it decided to rest its case at the end of the DLSE's case-in-chief. It therefore cannot be heard to complain of a due process violation when it refused to enforce its subpoena or ask for a continuance to secure the witness's attendance. (Accord, *Monaghan v. Department of Motor Vehicles* (1995) 35 Cal.App.4th 1621, 1626.) Moreover, the Director reviewed the penalty imposed by Nagtalon de novo, and in so doing applied the statutory factors set forth in former section 1777.7 subdivision (f). Any testimony regarding the penalty that Lusardi sought to obtain from Nagtalon was not binding on the Director, and therefore, Lusardi's failure to secure Nagtalon's testimony did not deprive it of due process.

## DISPOSITION

The order is affirmed. Costs are awarded to Real Party in Interest and Respondent.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

BUCHANAN, J.

25

Filed 6/25/24

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LUSARDI CONSTRUCTION COMPANY, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> DEPARTMENT OF INDUSTRIAL RELATIONS et al., <br><br> Defendants and Respondents. <br><br> DIVISION OF LABOR STANDARDS ENFORCEMENT, <br><br> Real Party in Interest and Respondent. | D081704 <br><br><br> (Super. Ct. No. 37-2020-00021750-CU-WM-NC) <br><br><br><br> ORDER GRANTING REQUEST FOR PUBLICATION |

THE COURT:

The opinion in this case filed May 28, 2024, was not certified for publication.  It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.


McCONNELL, P. J.

Copies to:  All parties